IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JOHNNIE MASSEY,                 )<br>                                          )<br>         Plaintiff,                  )<br>                                          )<br>v.                                       )<br>                                          )<br>CAROLYN W. COLVIN,[1] ACTING )<br>COMMISSIONER OF           )<br>SOCIAL SECURITY,             )<br>                                          )<br>         Defendant.              )<br>_____ ) | Civil Action No. 3:12-3483-TMC-JRM<br><br><br><br><br>**REPORT AND RECOMMENDATION** |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff protectively filed applications for DIB and SSI on December 11, 2009, alleging disability beginning April 24, 2008. Tr. 235-248.[2] Plaintiff's claims were denied initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on August 22, 2011, at which Plaintiff and a vocational expert ("VE") appeared and

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this lawsuit.

[2]The Administrative Law Judge dismissed Plaintiff's DIB application because her date last insured was June 30, 2009, which predated the most recent ALJ denial (on October 19, 2009) of Plaintiff's previous application (February 10, 2005) for DIB.

testified. Tr. 32-61. The ALJ issued a decision on September 1, 2011, finding Plaintiff was not disabled because the ALJ concluded that work exists in the national economy which Plaintiff can do.

Plaintiff was forty-six years old at the time of the ALJ's decision. She received her GED and previously worked as a cloth winder, electronics tester, fast food worker, hand packager, material handler, and cashier. Tr. 35-36, 268-274. Plaintiff alleges that she became disabled due to fibromyalgia, memory loss, headaches, depression, weakness, Type II diabetes, anxiety, widespread body pains, anemia, chest pain, carpal tunnel syndrome, crying spells, high blood pressure, asthma, numbness and tingling in her hands and feet, leg pains, and shortness of breath. Tr. 281

The ALJ found (Tr. 13-26):

1. The claimant has not engaged in substantial gainful activity since December 11, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: fibromyalgia, pain in hands, lumbar spondylosis, respiratory impairment, obesity, depression and anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light and sedentary work as defined in 20 CFR 416.967(b) except that she is limited to unskilled jobs involving simple, routine and repetitive work. She should work in a non-production setting, working with things, and have limited interaction with others. She should not perform continuous handling and fingering bilaterally. She should not climb ladders or scaffolds, and should only occasionally balance, stoop, crawl, kneel, and crouch. The claimant should not have concentrated exposure to hazards, dusts, fumes, or gases. Finally, she should have the ability to change between the sitting and standing positions to accommodate discomfort.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on November 28, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 11, 2009, the date the application was filed (20 CFR 416.920(g)).

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

**MEDICAL EVIDENCE**

Plaintiff saw Dr. Sung Chang of Southeast Pain Care on May 31, 2007 for evaluation of back pain. Dr. Chang noted tenderness to palpation over Plaintiff's bilateral SI joints. Dr. Chang's assessment was sacroiliac joint arthropathy, lumbar spondylosis, and consider lumbar radiculopathy. Dr. Chang administered a bilateral sacroiliac joint injection under fluoroscopy and increased Plaintiff's dose of Tylox. Tr. 396-398. Plaintiff returned to see Dr. Chang on August 27, 2007, complaining of persistent lower back pain. Plaintiff reported overall benefit from past SI joint injections. Tr. 391-392. Dr. Chang attempted to give Plaintiff a bilateral L5 and S1 diagnostic medial branch under fluoroscopy, but was unable to complete the procedure due to Plaintiff's inability to tolerate it. Dr. Chang ordered an MRI of Plaintiff lumbosacral spine. Tr. 393-394.

On September 17, 2007, Dr. Chang wrote that none of the previous procedures tried had been particularly beneficial to the Plaintiff, and stated that she was only left with medication management. It was noted that the MRI of Plaintiff's lumbosacral spine appeared to show some type of typical fatty marrow changes versus that of a hemangioma, and that otherwise there was no evidence of any particular facet disc herniations, congenital or acquired stenosis. Dr. Chang opined that a good portion of Plaintiff's symptoms were related to depression, and recommended a psychiatric evaluation. Dr. Chang also started a trial of Robaxin and decreased Plaintiff's Tylox in an effort to wean her off Tylox. Tr. 388-390. Dr. Chang saw Plaintiff again on November 5, 2007, and recommended placement of a spinal cord stimulator. Tr. 386-387. On January 30, 2008, Dr. Chung examined Plaintiff and assessed myofascial pain and lumbar spondylosis, and also noted that Plaintiff was interested in spinal cord stimulation. Tr. 384-385.

Plaintiff was seen at Heath Springs Medical Center on August 8, 2008 by Dr. Ifediora F. Afulukwe, who evaluated Plaintiff for complaints of pain and cramps all over her body. Dr. Afulukwe noted diffuse pains and cramps, refilled her prescription for Tylox, and gave her samples of Zanaflex. Tr. 410-411.

On August 22, 2008, Dr. John C. Whitley, III performed a consultative psychological evaluation of Plaintiff. Dr. Whitley noted that Plaintiff had a troubled childhood and adult life. Plaintiff complained of episodic pain in both of her hands, constant back and pelvis pain, some chest pain in her heart muscles, constant knee pain with swelling in her feet and ankles, and daily headaches. Plaintiff reported being uncomfortable around groups of people, feeling jittery in public places, feeling depressed, crying at least twice per week, and having little patience with other people. Dr. Whitley's notes reflect Plaintiff had poor eye contact and borderline intelligence. Dr. Whitley's impression was dysthymic disorder, rule out pain disorder due to a general medical condition, medical issues, and loss of functioning. He assigned a current Global Assessment of Functioning ("GAF") score of 58.[3] Tr. 400-403.

---

[3] The GAF contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning, generally for the level of functioning at the time of evaluation. A GAF score between 21 and 30 may reflect that "behavior is considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment." A score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas," 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning," 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," and 61 and 70 reflects "mild symptoms" or "some difficulty in social, occupational, or school functioning ." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). It should be noted that in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders:

> [i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.

(continued...)

On September 4, 2008, Plaintiff complained to Dr. Afulukwe about numbness in her hands and feet and breathing problems. Plaintiff reported a long history of numbness that was getting progressively worse. She also complained of pain associated with the numbness. Dr. Afulukwe recommended Plaintiff undergo EMG testing to evaluate for neuropathy. Plaintiff also complained of shortness of breath, which Dr. Afulukwe attributed to Plaintiff's long time cigarette smoking habit. Tr. 404-406.

On December 8, 2008, Plaintiff saw Dr. Afulukwe for chronic aches and pains. He diagnosed fibromyalgia syndrome with diffuse musculoskeletal pains. Tr. 415-417. Plaintiff saw Dr. Afulukwe again on April 7, 2009, and he again diagnosed fibromyalgia and neuropathy. He refilled her Tylox and Lovastatin. Tr. 419-420.

On August 3, 2009, Plaintiff presented to Springs Memorial Hospital with complaints of generalized body aches. Plaintiff was admitted with diabetic ketoacidosis. She was discharged on August 10, 2009. Tr. 425-457, 500-511. Plaintiff was admitted again to Springs Memorial Hospital on August 19, 2009, with complaints of generalized weakness and pedal edema. Persistent anemia was diagnosed. She was hospitalized until August 25, 2009. Tr. 458-499.

On September 18, 2009, Dr. Afulukwe evaluated Plaintiff in a hospital follow-up. Plaintiff reported feeling better but still did not feel normal. Dr. Afulukwe diagnosed new onset of diabetes and adjusted her medications. Tr. 521-523. On November 16, 2009, Dr. Chukwuma Ogugua evaluated Plaintiff for multiple joint and back pain as well as left arm numbness and tingling. He

---

[3](...continued)
Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013).

diagnosed diffuse bone pain. Dr. Ogugua discussed smoking cessation, adjusted her medications, ordered various tests, and said he would refer her to a cardiologist. Tr. 524-525.

Plaintiff was treated in the emergency room on November 18, 2009 for chest pain with pain radiating into her left arm and left side of the jaw with sweating, nausea, and shortness of breath. Chest x-rays were normal with no active pulmonary disease. Tr. 558. She was admitted to the hospital for cardiac catheterization on November 20, 2009, which showed mild to moderate coronary artery disease, with a 50% to 55% narrowing in a very small third margina1 branch. Tr. 514-518.

On January 15, 2010, Dr. Ogugua evaluated Plaintiff for multiple complaints including pain in her feet and ankles and nocturnal leg cramps. Tr. 526-527. On February 12, 2010, Dr. Ogugua noted that Plaintiff continued to have generalized body aches. He indicated that Plaintiff's DEXA scan showed overt spinal osteoporosis and femoral neck osteopenia. Dr. Ogugua advised smoking cessation and asked Plaintiff to keep a log of her finger stick glucose testing. Tr. 528-529.

On April 13, 2010, Plaintiff reported to Dr. Afulukwe she had no new complaints and was doing fairly well, but noted continued issues with chronic pain. Tr. 583. Dr. Afulukwe noted fibromyalgia syndrome with generalized aches and pains, and stated that he would continue Plaintiff on her medications. Tr. 583-585.

On April 27, 2010, Plaintiff had an intake evaluation at Catawba Mental Health Center. Plaintiff reported a depressed mood most of the time, crying spells, sleep and appetite disturbance, feelings of hopelessness and worthlessness, decreased energy, withdrawal and isolation from others, poor concentration, auditory hallucinations, anxiety, restlessness, feelings of tenseness, panic attacks, avoidance of public places, irritability, outbursts of anger, and severe mood swings involving uncontrollable behavior when angry. She indicated that she spent all day in bed three or four times

a week. It was noted her affect was flat and tearful, and her mood was anxious, depressed, and angry. Plaintiff was diagnosed with psychotic disorder NOS, mood disorder NOS, anxiety disorder NOS, and a GAF score of 55. Tr. 601-609.

On May 8, 2010, licensed psychologist Dr. Chad Ritterspach performed a psychological evaluation of Plaintiff. Mental status examination indicated that Plaintiff's mood was depressed and her affect was constricted. Dr. Ritterspach noted Plaintiff's thought content was full of depressive cognitions. Dr. Ritterspach estimated Plaintiff's intellectual functioning was in the borderline to low average range, and her memory and concentration were mildly impaired. Dr. Ritterspach's diagnostic impressions were PTSD; major depressive disorder, moderate, recurrent; and a GAF score of 55. He found no signs of malingering. Tr. 541-543.

A Psychiatric Review Technique Questionnaire and Mental Residual Functional Capacity ("RFC") Assessment were completed by Dr. Craig Horn, a state agency psychologist, on May 16 and May 19, 2010, respectively. Tr. 68-81, 90-93. Dr. Horn opined that Plaintiff had medically determinable mental impairments causing mild restriction in daily activities; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Horn indicated that Plaintiff's impairments would not prohibit the ability for simple routine work away from the public. Tr. 80.

A Physical RFC Assessment was completed by Dr. Dale Van Slooten on May 19, 2010. He opined that Plaintiff was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently, standing/walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday. Dr. Van Slooten indicated that Plaintiff could occasionally crawl and climb ladders, ropes, or scaffolds and could frequently perform all other postural activities. Tr. 82-89.

On October 28, 2010, Dr. Ogugua noted bilateral lower paraspinal muscle tenderness, and prescribed Neurontin, Soma, Flexeril, and Tylox. Plaintiff reported her sugar levels were better, but described increasing numbness in her hands. Tr. 612-613.

On November 10, 2010, Plaintiff was evaluated at Catawba Mental Health Center for medication refills, auditory hallucinations, increased anxiety, and depression. Plaintiff was restarted on Paxil, was given an increase in her dose of Abilify, and was prescribed Vistaril for anxiety and insomnia. Tr. 617.

On November 11, 2010, a Physical RFC Assessment was completed by Dr. Seham El-Ibiary. He opined that Plaintiff was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently; standing/walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday. Dr. El-Ibiary opined that Plaintiff could frequently climb ramps and stairs and could occasionally perform all other postural abilities. Dr. El-Ibiary noted that she was limited to frequent bilateral handling and fingering. He also indicated that Plaintiff would need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. 126-133.

Two Psychiatric Review Technique Questionnaires and a Mental RFC were completed by Dr. Xanthia Harkness, a state agency psychologist, on November 15, 2010. Tr. 98-111, 112-125., 134-137. Dr. Harkness opined that Plaintiff had medically determinable mental impairments causing mild restriction in daily activities; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Harkness stated that Plaintiff overall had severe mental impairments that would not preclude simple, unskilled work in a job that did not require frequent public contact. Tr. 124.

On February 14, 2011, Plaintiff presented to the emergency room stating that she had pain in her lower back that radiated around to her abdomen and up to her left breast. Physical examination revealed that her back was non-tender, normal to inspection, and had painless range of motion. She was diagnosed with right flank pain. Tr. 624-626.

Dr. Ogugua noted on June 24, 2011 that Plaintiff had good hand grips, an intact gait, and no pedal edema. Tr. 647. Dr. Ogugua completed a RFC questionnaire, and stated that Plaintiff's prognosis was guarded and that her fibromyalgia, cervical spondylosis, and neuropathy were supported by objective signs of tender points and bilateral lower paraspinal muscle tenderness. Tr. 650-654. He opined that Plaintiff could sit for about four hours in an eight-hour day, stand/walk about two hours, needed unscheduled breaks, had to use a cane to ambulate, could only occasionally lift up to ten pounds, and could rarely lift up to twenty pounds. Tr. 650-654. Dr. Ogugua opined that Plaintiff would constantly experience interference with attention and concentration and was incapable of even low stress jobs. Tr. 651.

On June 27, 2011, Plaintiff had a mental health assessment at Catawba Mental Health Center. Tr. 658-664. It was noted Plaintiff appeared very uncomfortable and had a restricted affect. Plaintiff reported feeling that Cymbalta had lost its effectiveness. Plaintiff was isolated at home and had increased crying, and was also slightly paranoid. Plaintiff reported decreased energy, motivation, and lack of interest. She reported not being able to focus or concentrate. Tr. 658. On July 20, 2011, treatment notes from Catawba Mental Health Center indicated that Plaintiff had not responded well to individual therapy or medications. Tr. 657.

**HEARING TESTIMONY**

At the administrative hearing, Plaintiff testified that she had sharp, stabbing pain that generally lasted four to five hours, or all day long. Tr. 41-42. She testified that she had crying spells, feared being around people, stayed home by herself most of the time, and stopped going to church. Tr. 42-43. She said she also had trouble remembering things such as her age. Tr. 53. Plaintiff said that she only slept two to three hours per night. Tr. 44-45.

When asked about her functional limitations, Plaintiff testified that she could not lift a gallon of milk because her hands ached and tingled, and said it was hard to pick up coins. Tr. 50-51. She estimated that she could walk thirty yards and stand ten to fifteen minutes before she would need to sit due to pain. Tr. 52. She said she could sit in a chair for thirty to forty minutes, but then would have to get up because her feet swelled. Tr. 52-53.

Plaintiff reported that she lived by herself and was able to take care of her personal needs. Tr. 36-37. She cooked, did dishes, made her bed, did light laundry, swept and vacuumed the floors, cleaned the bathroom, went grocery shopping with her daughter, drove herself to appointments, spent time with her adult children, and watched television. Tr. 36-38, 40.

**DISCUSSION**

Plaintiff alleges that the ALJ: (1) improperly relied on the VE's testimony; (2) failed to properly consider her combination of impairments; and (3) improperly disregarded the opinion of treating physician Dr. Ogugua. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff was not disabled under the Social Security Act.

A.     VE Testimony

Plaintiff alleges that the ALJ erred by relying on VE testimony that she could perform the jobs of mail clerk and toll collector because there is a conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony. She asserts that both the mail clerk and toll collector jobs have a general educational development ("GED") reasoning level higher than that allowed by the ALJ's restriction that she perform simple, routine, repetitive tasks. The Commissioner contends the ALJ properly relied on vocational testimony that Plaintiff could perform the jobs of mail clerk and toll collector. In particular, the Commissioner argues that the increasing majority of courts have found that GED reasoning level 3 work is not inconsistent with the ability to perform only simple tasks, and that there is nothing in the record to suggest that Plaintiff could not satisfy the requirements of GED reasoning level 3 such that there was no conflict between the VE's testimony and the DOT.

The parties do not dispute that the jobs identified by the VE have a reasoning level of 3. The DOT defines a reasoning level of 1 as requiring a worker to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." U.S. Dept. of Labor, Dictionary of Occupational Titles, App. C § III, 1991 WL 688702 (Fourth Ed. Rev.1991). A reasoning level of 2 indicates that the job requires the worker to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and to deal] with problems involving a few concrete variables in or from standardized situations." Id. A reasoning level of 3 indicates that the job requires the worker be able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form [and to deal] with problems involving several concrete variables in or from standardized situations." Id. SSR 00-4p provides:

12

> Occupational evidence provided by a VE or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE and VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.

The Fourth Circuit has not addressed whether a claimant who is limited to simple, routine, repetitive work is capable of performing jobs that the DOT classifies as reasoning level three. Several district courts in the Fourth Circuit have remanded for further administrative proceedings where the ALJ failed to question the VE as to whether a claimant limited to level 2 or 3 work was capable of performing such work. See, e.g., Yurek v. Astrue, NO. 5:08-cv-500-FL, 2009 WL 2848859, at *9 (E.D.N.C. 2009)(finding "that the DOT's reasoning level three requirement conflicts with the ALJ's prescribed limitation that Claimant could perform only simple, routine, repetitive work" and remanding to the ALJ to address the conflict); Tadlock v. Astrue, C.A. No. 8:06-3610-RBH, 2008 WL 628591, at *10 (D.S.C. 2008)(remanding for the VE to provide testimony as to whether the claimant could perform the recommended jobs, which had a reasoning level of 2, where the claimant was limited to simple and routine work); but see Marshall v. Barnhart, No. Civ. A. DCK 01-2211, 2002 WL 32488432 at *10 (D.Md. Sept. 27, 2002)(declining to find any conflict between the reasoning level 3 jobs identified by the VE and the claimant's limitation to simple, repetitive, 1, 2, 3, step tasks).

The Commissioner urges the Court to follow other circuits which have found that a reasoning level of 3 was not inconsistent with the ability to perform "simple" work or work that was not complex. See Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009)(holding that GED level 3 reasoning was not inconsistent with ability to perform "simple" work); Renfrew v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007)(finding that unskilled GED level 3 reasoning jobs were not "complex" and not

13

inconsistent with the claimant's limitations to not perform complex technical work). These cases are not binding on this Court. The Seventh Circuit in Terry found that level 3 reasoning was not inconsistent with the ability to perform "simple" work, and the Eighth Circuit in Renfrew found that this level was not inconsistent with complex work. The ALJ in this case, however, limited Plaintiff to simple, routine, and repetitive work (which additionally had to be in a non-production setting, working with things, and limited access with others). Additionally, the Tenth Circuit, in Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005), remanded a case where there was an apparent conflict between the Plaintiff's inability to perform more than simple and repetitive tasks and the level 3 reasoning required by the jobs identified by the VE.

There appears to be a conflict between Plaintiff's RFC (as found by the ALJ) and the requirements of the jobs identified by the VE. Although the ALJ asked the VE whether the description of jobs was consistent with the DOT, to which the VE replied "yes" (Tr. 56), it cannot be concluded that the VE was specifically aware of the potential conflict between Plaintiff's RFC for unskilled jobs involving simple, routine, and repetitive work and the identified jobs which had a reasoning level of 3. It is recommended that this action be remanded to the Commissioner and that the ALJ be instructed to obtain VE testimony as to any conflict between the reasoning levels for the jobs identified by the VE and the limitations imposed by the ALJ.

    B.    <u>Treating Physician</u>

Plaintiff alleges that: (1) the ALJ did not give logically or legally sufficient reasons for assigning little weight to Dr. Ogugua's opinions; (2) Plaintiff's impairment of fibromyalgia sufficiently supports Dr. Ogugua's opinions; (3) Dr. Ogugua's records reflect problems with Plaintiff's hands; and (4) Plaintiff's testimony was not inconsistent with Dr. Ogugua's opinions. The

14

Commissioner contends that the ALJ reasonably accorded little weight to Dr. Ogugua's restrictive opinion of Plaintiff's abilities because the opinion was not accompanied by any supporting clinical test results and was not consistent with Dr. Ogugua's own normal and mild examination findings. The Commissioner argues that Plaintiff's arguments are only supported by Plaintiff's own statements and there are no objective findings contained in the medical notes to support these subjective statements. Additionally, the Commissioner argues that the ALJ accommodated Plaintiff's limitations with her hand in his RFC and any error is harmless because the VE testified that Plaintiff could still perform other jobs even with this limitation. In her reply brief, Plaintiff argues that her fibromyalgia impairment supports Dr. Ogugua's opinion because the Commissioner fails to refute the fact that this impairment does not produce objective symptoms; Dr. Ogugua's records reflect problems with her hands which would prevent her from lifting more than ten pounds; and the Commissioner failed to address her allegations that her testimony was not inconsistent with Dr. Massey's opinion.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527 and 416.927; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

It is unclear from the ALJ's decision whether his opinion is supported by substantial evidence. Although it appears that the ALJ properly discounted Dr. Ogugua's opinion because it is not well supported by his treatment notes, the ALJ also discounted this opinion because the ALJ believed the opinion was contradicted by Plaintiff's own testimony. Review of Plaintiff's testimony, however, fails to support this assertion. The ALJ wrote that Plaintiff testified that she could do more than Dr. Ogugua opined because Plaintiff allegedly said she did not need a cane and she could walk about thirty minutes. Tr. 21, see also Tr. 19. Plaintiff disputes this testimony and the Commissioner did not address this discrepancy in her brief. During the hearing, Plaintiff testified that she could only walk for twenty-five to thirty yards, not that she could walk for thirty minutes. See Tr. 52. There is no indication that she testified that she did not need a cane. In her function report, Plaintiff wrote that she could only walk twenty-five to thirty yards and that she used a cane (although it was not prescribed for her). Tr. 314-315.

16

It is recommended that this action be remanded to the Commissioner for the ALJ to evaluate Dr. Ogugua's opinion in light of all of the evidence. Upon remand, the ALJ should also consider Plaintiff's remaining allegations of error.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to evaluate the opinion of Plaintiff's treating physician (Dr. Ogugua) in light of all of the evidence, to determine whether there are a significant number of jobs which Plaintiff can perform in the national economy, and to consider Plaintiff's remaining allegations of error concerning her combination of impairments.

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey  
United States Magistrate Judge

December 10, 2013  
Columbia, South Carolina

17